# CIRCUIT COURT OF BALTIMORE CITY.

Filed May 1, 1915.

WASHINGTON I. TUTTLE, JR.,
VS.
MARIE S. TUTTLE.

*Albert S. J. Owens* and *John C. Tolson* for Washington I. Tuttle.

*W. S. Symington, Jr.,* for Mrs. Tuttle.

BOND, J.—

It must be kept in mind in discussing a case of this sort that the law does not interfere to remedy every injustice, or even every great injustice, in the relation of a man and his wife. It creates the relation, requires the husband to provide for his wife during its continuance, and in a few exactly defined situations it extinguishes the relation partially or entirely. It does no more. All inequalities or injustices which are not reached in these processes are left to the married pair to remove, or to endure as part of their undertaking in marrying. I am afraid these considerations were overlooked somewhat in the argument. We have only to determine whether upon the facts shown by the evidence the situation defined by the Code as requiring the relief prayed, has arisen.

The husband prays a divorce a vinculo matrimonii on the ground of abandonment by the wife, and the wife after denying abandonment by her prays, in a cross-bill, a divorce a vinculo matrimonii on the ground of abandonment by him, and prays an award of permanent alimony.

It appears that they were married in May, 1908, against the wishes of their parents, or at least against the wishes of her parents, and lived in or about Baltimore until early in 1910. Their life here was not one of unbroken happiness; the wife had her husband arrested on a charge of cruelty in 1909, and filed a suit for a

divorce a mensa et thoro in December, 1909, on the ground of cruelty. That suit was not further prosecuted, for the parties came together and left for Rochester, New York, early in 1910, where the husband sought employment after having had to resign from the employment of his father in this city. The wife's parents also removed from Baltimore to Rochester at about the same time. Rochester had been their original home.

No events disturbing the married life of the husband and the wife in Rochester prior to July, 1910, have been detailed here, but it seems that their relations during this time were not happy, and that they were close to separation in July. The wife was then living with her own people, and was temporarily residing outside of Rochester. In that month of July the husband's father appeared in Rochester and offered the son a new position in Baltimore, and the son decided to accept it. Whether the wife was told of this by her husband or his father, or only by attorneys employed by the husband, is a matter of dispute. But the wife did receive a letter from a firm of attorneys saying that the husband had consulted them with reference to difficulties which existed between the two, and proposed to accept a position in Baltimore and there furnish and provide a home for the wife and for the child, which had been born in April, 1909. They suggested that if the wife desired any other arrangement she call on these attorneys with counsel of her own to make some amicable and just arrangement. From a second letter it appears that she did employ counsel. The husband, she was told, would see her and try to persuade her to go with him.

The husband left Rochester as arranged, and the wife remained there with her child. They never again came together.

It is difficult to decide with assurance what did cause this breach. In their subsequent letters the parties divide the blame. The wife said she erred in letting herself be guided by her parents, with whom she was then living; and this, indeed, appears to have been the strongest factor in the separation. But on the other hand she charges the husband with having failed to support her and the child, and she testifies to a fear that she was being tricked in 1910 by the husband and his father. She had a suspicion that the discharge of the husband from his father's employ and the removal to Rochester soon after she had instituted her suit for a divorce a mensa et thoro, followed by the offer of a new position in Baltimore a few months later, all constituted a trick for some purpose disadvantageous to her.

The husband wrote the wife from Baltimore, in a respectful, almost affectionate manner, urging her to come to him, yet offering to see that she was taken care of if she did not come. A letter from him of October 8, 1910, speaks of having written several similar letters, and again urges the wife to come to Baltimore for the baby's sake if not for her own. This letter declares to the wife that the husband will give her no support while she remains at home, with her own people.

None of the husband's letters of this period were answered. In November he wrote three letters addressed to his infant son at the grandparent's address, and they were all returned by the postal authorities marked: "Removed, no order."

From that time until the latter part of January, 1913, a space of two years and more, no communication whatever passed between the two. Neither made an effort to see the other; the husband made no effort to see the children; their lives were lived completely apart. On February 1st, 1911, a second child was born entirely without the father's knowledge; although it seems he knew before the separation that it was to be born.

While there is room for doubt, in the absence of better knowledge of the circumstances leading the wife to return to her parents and to refuse to leave Rochester with her husband, the facts just narrated established, I think, an abandonment by the wife and not by the husband. It is the wife's part to take the home offered by her husband wherever it may be, unless there are circumstances which justify the wife in leaving the husband. The wife has the burden of showing such circumstances, and none such appear from the evidence.

But the mere fact of abandonment by the wife in 1910 is not, of course, decisive of the case. To justify a divorce the court must be satisfied by

competent testimony "that the party complained against has abandoned the party complaining, and that such abandonment has continued uninterruptedly for at least three years, and is deliberate and final, and the separation of the parties beyond any reasonable expectation of reconciliation" (Bagby's Code, Art. 16, Sec. 37). And I think it clear that if we take the wife's failure to follow her husband in 1910 as constituting an abandonment, it was not an abandonment which continued uninterruptedly for at least three years.

On January 26, 1913, the wife wrote the husband a letter asking for help to meet some extraordinary expenses of the children. This letter revealed to the husband that the wife was at work, at a small salary, that the children had been sick, small operations performed, and that the wife's earnings were not sufficient to give them the care they should have. Rather diffidently she suggests that the husband might wish to help under the circumstances.

This opened a correspondence which lasted throughout the year 1913; and the letters are remarkable for many reasons. Counsel on each side suggest that the letters from the other side may have been prepared under the advice of counsel with a view to a possible suit for divorce; but I see no appearance of such guidance in the letters. That the wife carefully made copies of all of her letters is unusual, but her explanation is plausible, and the letters themselves to my mind leave no room whatever for the assumption that they were written under the advice of counsel or with any purpose other than appears on their face.

The husband, replying to the wife's first letter, said it had upset him, and that in view of the difficulties the wife had experienced it would have been better if she had written before. He offered to make her and the children an allowance, and asked that she resign her employment; but to supersede all this suggested that they were three years older, and could overlook their mistakes and start again. "Now," he wrote, "if you care to come to Baltimore, I think that I could provide a home that would be a home for us all." The husband missed the children, he said, and although he ex-

pressed no affection for the wife, he said he would prefer to have her come to Baltimore.

The wife, at first, was doubtful about the possibility of making a home that would last; she doubted the husband's feeling for her, and said she feared the possibility that he might again treat her improperly. But she soon yielded and grew in enthusiasm for the prospect of a home. The husband, on the other hand, hesitated and advised her to reflect upon it, as he wished to avoid another false start. And so the letters went on through the first half of the year 1913; the wife's affectionate, full of little intimate domestic things, showing a woman burdened but uncomplaining, and hoping for the home; the husband's letters businesslike—where they should have been otherwise—fending off further and further the adoption of his proposal for a home, rather pointedly sending his love to the children, and generally expressing a sense of duty performed. Later the husband's letters became fewer, but she wrote regularly even though some of her letters lay unanswered. In a letter of July 13, 1913, the husband finally wrote: "I can hardly see how you can expect to use me as the convenience. Have given you two homes, both being destroyed by them (her parents) or as you say by their influence, and now you do not get along with them you want me to start all over again. Well, I would be only too happy to do same if I thought it was for always, but I cannot see the matter that way and will not until I do," and he continued in that position.

The correspondence was continued irregularly through the year 1913. Not until September did the wife remind the husband that he had duties and obligations to perform. Up to that time she had been patient and conciliatory under severe tests. Even after that time the relations of the two were free from anger or discourtesy. The husband continued to send supplies and to write rather perfunctory letters to the wife.

It was while the correspondence between the two was still running on that the husband on December 20, 1913, filed his suit for divorce, without any intimation to the wife of his intention to do so. Jurisdiction was had by publication of notice to the wife.

I do not see that there can be two readings of the story of this correspondence. In it the wife returned to the husband, and he rejected her. Her offer to return, while it was at first accompanied with some misgivings, and pointed out what she thought were intolerable acts of the husband in their former life together, was unmistakably made in a spirit of full reconciliation. Indeed, she was obviously happy and glad at the possibility. Any woman in her position would have had some misgivings; no woman, I think, could have yielded more completely. Her only relatives, from whom she could get some small assistance, were in Rochester. Her return to her husband in Baltimore would involve a breach with these; yet the husband's suggestion of a new home was not fortified with any warmth of feeling for her.

It is clear, I think, that the husband retained no affection at all for his wife, and could not when he faced it tolerate the idea of their living together. The filing of his suit without any new conditions to suggest it seems to make his previous attitude unmistakable. He has, therefore, no ground for divorce in an abandonment by the wife continued throughout the space of three years, as averred in his bill of complaint; and that bill will be dismissed.

If my analysis of the evidence of events in the year 1910 is correct, the wife's prayer, in her cross-bill, for a divorce a vinculo matrimonii is also unsupported by proof of abandonment by the husband continued throughout a space of three years, and that prayer cannot be granted. I have found that no abandonment by the husband in 1910 was proved. If his action in 1913 constituted an abandonment of his wife, still that abandonment was not one continued throughout a space of three years. It did in my opinion constitute an abandonment and desertion upon which a divorce a mensa et thoro may be decreed if the wife wishes that relief under her prayer.

The prayer for alimony in the wife's cross-bill remains to be acted upon. Alimony is not in this State only incident to divorce. It is an independent relief, and irrespective of divorce may be granted to the wife as separate maintenance when she is forced to live apart from the husband by such acts as would constitute an abandonment by him within the meaning of the statutes defining the grounds for divorce. As I have said, I think separation for such a cause does exist here. The husband has, from time to time, since January, 1913, voluntarily furnished his wife and children money and supplies, but this provision was irregular and far short of fulfilling the husband's legal obligation. Now that the court has in hand the legal adjustment of their relations it seems eminently proper that alimony be fixed and allowed in the decree. At the husband's present rate of income a payment of $1,000 a year to the wife for herself and her children would be in accordance with the usual practice, and that amount will be fixed in the decree.